ORDERED.

**Dated:  April 04, 2017**

Michael G. Williamson
Chief United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                          Case No. 8:15-bk-06982-MGW
                                                                Chapter 11

Print Harmony, LLC,

     Debtor.

_____/

## ORDER AND
## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

     The Debtor leased commercial space from Rubin Automobile Boulevard, LLC under a triple net lease. Rubin filed a proof of claim in this case seeking $676,713.05 for amounts allegedly due under the lease, including unpaid prepetition and postpetition rent, repairs to the leased premises, rejection damages for future rent, and breach of a purchase obligation. According to Rubin, the Debtor used a flood in a small portion of the premises as a pretext to stop paying rent for the entire premises, thwarted Rubin from repairing the flood damage, and then moved out, leaving the premises trashed.

But the evidence at trial on the Debtor's objection to the Landlord's proof of claim told a slightly different story. By seeking to use the casualty event as an opportunity to upgrade the building's electrical system, it was Rubin that prevented the flood damage from being repaired. And while there was evidence the property had been damaged, Rubin was unable to prove whether the damage had been done by the Debtor or a predecessor tenant. Even if it had proven that the Debtor caused the damage, Rubin could not prove the repairs it was proposing were necessary to restore the property to its preexisting condition—or that they would ever be done at all. As for the purchase obligation, all of the evidence at trial showed that Rubin waived any right to require the Debtor to buy the leased premises. In the end, Rubin was only able to prove it was entitled to a $123,169.21 allowed claim for prepetition rent and a $6,041.40 administrative claim for postpetition rent that had been abated during the case.

## Findings of Fact

### *The Parties*

The Debtor is a commercial wholesale internet printer.[1] Its customers mostly consist of other (small) printers and advertising agencies who generally insist on a short turnaround time.[2] The Debtor's principal, Jason Gabay, also owns Press Ex, Inc.,[3] a separate retail internet printing company that filed for chapter 11 bankruptcy

---

[1] Trial. Tr. at p. 187, ll. 12 – 20.

[2] *Id.* at p. 187, ll. 18 – 20; p. 210, ll. 5 – 8.

[3] *Id.* at p. 187, ll. 14 – 17.

in 2009 and confirmed a chapter 11 plan on March 7, 2011. Rubin Automobile Boulevard, LLC (the "Landlord") owns office and warehouse space located at 12910 Automobile Boulevard, Clearwater, Florida, which had previously been leased by PressEx.

*The Lease*

On July 25, 2011, the Debtor entered into a five-year lease with the Landlord for 38,700 square feet of office and warehouse space that PressEx had been leasing.[4] According to the lease, the leased premises consisted of 10,750 air-conditioned square feet of office space and 27,950 air-conditioned square feet of production space.[5] The lease term began on March 1, 2011, and was to expire on February 28, 2016. An addendum to the lease, however, provided that the Debtor would buy the leased premises from the Landlord at the end of the third lease year for $1.4 million.[6]

The Debtor's rent under the lease for the fourth and fifth lease years, which is the relevant time period in this dispute, was $11,500 and $12,000 per month, respectively.[7] But the lease expressly provided that the monthly rent would be abated if the premises were damaged:

---

[4] Landlord's Ex. 3; Trial Tr. p. 56, ll. 4 – 12; p. 56, l. 25 – p. 57, l. 9; p. 57, l. 20 – p. 58, l. 11; p. 188, l. 13 – p. 189, l. 2.

[5] Landlord's Ex. 3 at p. 2, ¶ 1.

[6] *Id.* at p. 2, ¶ 2(a) & p. 15. The lease is confusing in this respect. The Landlord is careful to refer to the provision in the lease addendum as a "purchase obligation"—not a purchase option. But if it is really an obligation to purchase at the end of the third lease year (or fourth lease year, if the parties extend it), what is the point of the fifth lease year?

[7] *Id.* at p. 15, Addendum.

3

> If the Premises are damaged, either partially or totally, the
> Rent for the period required for the repair or restoration of
> damage shall be paid up to the time of the casualty and
> thenceforth shall be abated, in proportion to the degree to
> which [Debtor's] use of the Premises is impaired, up to,
> but not in excess of, the proceeds received by Landlord
> under Landlord's rent loss coverage.[8]

In the event the leased premises were partially or totally damaged, the lease also

obligated the Landlord to make the proceeds from its casualty insurance policy

available to the Debtor so the Debtor could restore the premises to their existing

condition.[9]

### The Flood

On November 5, 2014, a plumbing issue damaged the Debtor's interior office

space at the leased premises.[10] Around 6:00 or 7:00 that night, Jason Gabay (the

Debtor's owner) noticed water flooding out of two bathrooms (either from the

urinals or toilets) on the north side of the office space.[11] Apparently some shop

towels or paper towels had clogged the toilet.[12] The water flooded about 30 feet from

the northern edge of the building into the Debtor's customer service and sales

offices.[13] As soon as he discovered the flood, Gabay called Level Construction, who

---

[8] *Id.* at p. 9, ¶ 18(a).

[9] *Id.* at p. 9, ¶ 18(b).

[10] Trial Tr. p. 41, l. 21 – p. 42, l. 4; p. 69, ll. 7 – 15.

[11] *Id.* at p. 203, l. 16 – p. 204, l. 3.

[12] *Id.* at p. 157, ll. 14 – 20.

[13] *Id.* at p. 203, l. 19 – p. 204, l. 3.

referred him to a plumber that came out and stopped the flooding.[14] After stopping the leak, the plumber referred the Debtor to Synergy Restoration & Construction to remediate the flood damage. Synergy came out and pulled up the carpet, removed wet drywall, moved furniture, and ran fans to dry out the wet areas.[15]

The cost of the initial remediation work was $12,127.35.[16] The Debtor's insurance policy did not cover the flood damage.[17] But the Landlord's insurance policy did. Hartford Insurance Company, the Landlord's insurance carrier, issued the Landlord a $7,127.35 check (the $12,127.35 cost of the repair less a $5,000 deductible) to cover the remediation work.

*The Dispute over the Scope of Repairs*

And this is where the first dispute began: the Landlord had insurance coverage to fix the remaining damage too, but the parties could not agree on the scope of the repair work. The Landlord obtained an estimate from Synergy, which did the initial remediation work for the Debtor. Synergy's estimate, prepared after a joint inspection with Hartford (the Landlord's insurer), was for $113,592.62, which included $30,312.60 in code upgrades.[18] On December 31, 2014, Hartford issued the Landlord a $74,952.02 check, which covered the total cost of the repairs less nearly

---

[14] *Id.* at p. 204, ll. 4 – 15.

[15] *Id.* at p. 204, l. 16 – p. 206, l. 1.

[16] Debtor's Ex. 3.

[17] Trial Tr. at p. 207, ll. 9 – 22.

[18] Landlord's Ex. 13.

$39,000 for code upgrades and building depreciation (those amounts would be paid once the code repairs were actually completed).[19]

But the Debtor objected to the Landlord's proposed scope of repairs. The Debtor believed the code upgrades were unnecessary. And it was concerned about what it perceived as unnecessary repairs, particularly the electrical upgrades, because those repairs potentially could have shut down the Debtor's business for a substantial amount of time.[20] The Debtor feared that if it lost customers because its business was shut down, those customers would not come back.[21] In short, the Debtor believed the Landlord was trying to improve its building at the expense of the Debtor's business.[22] In the Debtor's view, the safest thing to do was to simply put the building back the way it was.[23] So the Debtor obtained a $45,548.06 estimate from Level Construction & Design to restore the building to its previous condition.[24]

Suffice it to say, despite months of "negotiating," the parties were never able to agree on the scope of repairs.[25] And because the parties were unable to agree on the scope of repairs, the repair work was never done.[26] In the meantime, the Debtor

---

[19] *Id.*; Debtor's Ex. 2.

[20] Debtor's Ex. 9; Trial Tr. p. 209, l. 1 – p. 210, l. 3; p. 211, l. 7 – p. 212, l. 5; p. 219, ll. 8 – 12.

[21] Trial Tr. p. 210, ll. 3 – 8.

[22] Debtor's Ex. 9.

[23] Trial Tr. p. 209, l. 24 – p. 210, l. 2.

[24] Debtor's Ex. 5.

[25] Debtor's Exs. 7, 9 & 14.

[26] Trial Tr. at p. 74, ll. 4 – 11; p. 94, ll. 8 – 17; p. 134, ll. 11 – 15.

was forced to move its office space into unoccupied offices on the south side of the building, which had water damage from an unrelated event.[27] Eventually, the Debtor sued the Landlord to obtain the insurance proceeds so it could repair the premises and have its rent abated pending the repairs.[28]

*The Bankruptcy Case*

The Landlord, however, responded by suing to evict the Debtor for unpaid rent.[29] The state court in the eviction action entered an order requiring the Debtor to deposit the alleged past-due rent into the court registry.[30] Rather than deposit the alleged past-due rent into the state court registry, the Debtor filed this chapter 11 case on July 6, 2015.[31]

Two weeks after this case was filed, the Landlord moved for payment of $14,328.87 in stub rent for July.[32] The Debtor contended it was entitled to some credit against the rent due because the plumbing damage made the entire office space uninhabitable, forcing the Debtor to move their offices to another part of the building that it could have sublet to a third party. This Court ruled that the Debtor was required to pay 80% of its postpetition rent and other monthly charges without

---

[27] *Id.* at p. 69, ll. 22 – 24; p. 190, ll. 4 – 13.

[28] *Id.* at p. 217, l. 20 – p. 218, l. 2.

[29] *Id.* at p. 218, ll. 3 – 7; Landlord's Ex. 2.

[30] Trial Tr. at p. 218, ll. 8 – 14.

[31] *Id.*

[32] Doc. 18.

prejudice to the Debtor to contest the amount of postpetition rent due.[33] The Debtor

paid the partially abated rent for July and August.

*The Move-Out*

By the end of August 2015, however, the Debtor had vacated the premises.

According to the Debtor, it wanted to hire more employees and grow its business,

but it did not have enough room for its employees because the flood damage had not

been—and, in the Debtor's view, was not going to be—fixed.[34] The Debtor says if it

wanted to keep its business going, it had no choice but to move out.[35] So the Debtor

vacated the premises at the end of August and moved to reject the lease on

September 1, 2015.[36]

This is where the second dispute began: When it decided to move out, the

Debtor says it had its employees move out the equipment and then clean the

warehouse space.[37] The Debtor says it also hired an electrical contractor to

disconnect the equipment from the electrical system and Merry Maids to spend three

or four days cleaning bathrooms.[38] But the Landlord says the Debtor left the place

---

[33] Doc. 43.

[34] Trial Tr. at p. 189, l. 15 – p. 190, l. 13.

[35] *Id.* at p. 189, l. 24 – p. 190, l. 3.

[36] Doc. No. 54.

[37] Trial Tr. at p. 191, ll. 2 – 8.

[38] *Id.* at p. 191, ll. 9 – 20.

trashed and that it had to spend $8,000 – $9,000 cleaning up the mess,[39] which it had

its service technician (Dan Carter) take pictures of.[40]

<em>The Landlord's Claim</em>

The Landlord then filed a $643,059.50 unsecured claim in this case.[41] The

Landlord claims it is entitled to $128,087.78 in prepetition rent;[42] $172,898.55 in

repairs and cleanup;[43] $102,506.52 in rejection damages (i.e., future rent); and

$247,793 for a rejected purchase obligation.[44] The Landlord also filed a $25,427.20

administrative claim,[45] which includes $6,282.65 in rent that was abated during this

case.[46] The Debtor, however, has objected to the Landlord's claim and failed to

include it among the estimated unsecured debt in its plan. The Court has now tried

the Debtor's objection to the Landlord's proof of claim and the Landlord's

entitlement to an administrative expense, and enters these findings of fact and

conclusions of law.[47]

---

[39] *Id.* at 66, l. 6 – p. 67, l. 17.

[40] Landlord's Ex. 20; Trial Tr. at p. 20, l. 25 – p. 21, l. 3; p. 67, ll. 1 – 16.

[41] Proof of Claim #14.

[42] Landlord's Ex. 4; Trial Tr. p. 58, l. 15 – p. 60, l. 10.

[43] Landlord's Ex. 7.

[44] Landlord's Ex. 8.

[45] Doc. No. 99. Rubin's administrative claim was originally for $53,381.55. Rubin later voluntarily reduced its administrative expense claim.

[46] Landlord's Ex. 5; Trial Tr. p. 60, ll. 14-22.

[47] Rubin also moved to estimate its claim for confirmation. Doc. No. 81. But that motion is moot since the Court has tried and is ruling on Rubin's actual proof of claim.

## Conclusions of Law

This Court must determine the amount of the Landlord's claim. "When a proof of claim contains all the information required under Rule 3001, it 'constitutes prima facie evidence of the validity and amount of the claim.'"[48] Assuming the Landlord's claim is prima facie valid, then the Debtor has the burden of coming forward with enough evidence to overcome the Landlord's prima facie case.[49] If the Debtor overcomes the prima facie validity of the Landlord's proof of claim, then whichever party would bear the burden outside bankruptcy bears the burden of proof inside bankruptcy.[50]

Here, the Landlord bears the burden of proof on his proof of claim because it would bear that burden outside bankruptcy. The Landlord's claims are largely for breach of the parties' lease agreement. And under Florida law, a party suing on a contract bears the burden of proof,[51] although the party defending a contract action bears the burden of proof on any affirmative defense.[52] Except with respect to its prepetition and postpetition rents claims, the Landlord has failed to meet its burden of proof on each of the elements of his proof of claim.

---

[48] *In re Walston*, 606 F. App'x 543, 546 (11th Cir. 2015) (quoting Fed. R. Bankr. P. 300(f)).

[49] *Id.* (citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 701 (5th Cir. 1977).

[50] *Id.* (citing *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000)).

[51] *See Knowles v. C.I.T. Corp.*, 346 So. 2d 1042, 1042 (Fla. 1st DCA 1977).

[52] *Custer Med. Ctr. V. United Auto Ins. Co.*, 62 So. 3d 1086, 1096-97 (Fla. 2010).

## The Landlord largely proved its prepetition claim

The Landlord seeks $128,087.78 in prepetition rent.[53] The prepetition rent

claim largely consists of unpaid base rent, common area maintenance, and sales tax

for December 2014 through June 2015.[54] It also includes rent for the first six days of

July, $5,000 deductible for the remediation work, and miscellaneous other charges.[55]

The Debtor says it should be excused from paying rent after the date of the flood

because the Landlord breached the lease agreement by failing to make the insurance

proceeds available to repair the flood damage.

As a threshold matter, the Court agrees with the Debtor that the Landlord

breached the parties' lease. It is implicit in the lease that the Landlord was obligated

to insure the leased premises.[56] The parties' lease specifically provided that if the

premises are damaged, then the Landlord is obligated to make the insurance

proceeds available to the Debtor so it can restore the premises to their preexisting

condition.[57] There is no dispute that the Landlord never made the insurance proceeds

available to the Debtor because the parties could never agree on the scope of work

necessary to bring the premises to their preexisting condition. The question whether

the Landlord breached the lease, then, turns on whether the scope of repairs its

---

[53] Landlord's Ex. 4.

[54] Id.

[55] Id.

[56] Landlord's Ex. 3 at p. 3, ¶ 6(b); Trial Tr. at p. 101, l. 16 – p. 102, l. 4. The insurance, though, is paid by the Debtor as part of the CAM charges. Trial Tr. at p. 102, ll. 5 – 12.

[57] Landlord's Ex. 3 at p. 9, ¶ 18(b).

contractor proposed were necessary to restore the premises to their preexisting condition—or whether the repairs were an upgrade.

This decision, in turn, hinges on whether the upgrades the Landlord was seeking were required by the local building code. The Court heard from contractors from both sides.[58] This decision basically came down to a judgment call on which witness was more credible on that point, and on the whole, the Court is persuaded that the upgrades the Landlord was proposing were not required by the code.

The Landlord's breach, however, was not so material that it excused the Debtor's performance—i.e., its obligation to pay rent—as a whole. The Landlord contends that a reasonable interpretation of a contract, even if wrong, cannot constitute a material breach. But the Court need not go that far because by the Debtor's own admission, the flood only affected its office space, which only comprised—at most—1,485.69 square feet (or 3.84% of the premises).[59] And the Debtor continued to use the premises for another eight months. The Court is not convinced that the inability to use less than 4% of the premises constitutes a material breach.

But while the Landlord's breach did not excuse the Debtor's performance, the Debtor is entitled to abate a portion of its rent.[60] Under paragraph 18(a) of the lease, the Debtor is entitled to abate its rent in proportion to the degree to which its use of

---

[58] Trial Tr. at p. 144, l. 10 – p. 166, l. 19; p. 172, l. 10 – p. 186, l. 13.

[59] Landlord's Ex. 12.

[60] Landlord's Ex. 3 at p. 9, ¶ 18(a).

12

the premises has been impaired. The Debtor conceded at trial that the flood only affected the building's office space. That office space only comprised 1,485.69 square feet. Although the flood affected less than 4% of the total premises, the Debtor nonetheless contends it is entitled to abate all its rent because it was forced to relocate its office space to another unoccupied part of the building, thereby preventing the Debtor from subleasing that space. The problem is there was no evidence that the Debtor had any prospect of subleasing that space.[61] Because the lease limits any abatement to the portion of the space affected by a casualty event, the Debtor is entitled to a 3.84% abatement of the unpaid prepetition rent.

At trial, the Landlord put on competent evidence that it was owed $128,087.78. The Debtor contends that amount (1) includes $15,865.32 in improper water and sewer charges, and (2) fails to credit the Debtor for $25,600.74. The Court can see a reference to a $25,600.74 discrepancy in the Landlord's accounting.[62] But the time period for that accounting is only a subset of the entire lease term, and in any event, the Debtor failed to put on any evidence that it actually made the $25,600.74 in payments it says were not applied. And there's no convincing evidence that the Debtor was improperly charged for water and sewer. So the Landlord is entitled to $128,087.78 less a 3.84% abatement ($4,918.57), for a total $123,169.21.

---

[61] Trial Tr. at p. 189, ll. 7 – 14.

[62] Landlord's Ex. 4.

**The Landlord failed to prove its damages for repairs and clean-up.**

The Landlord seeks $172,898.55 for the cost of repairing and cleaning up the premises after the Debtor moved out.[63] The $172,898.55 consists of $27,810 to clean the filters on four air conditioning units, replace two 5-ton and one 10-ton air conditioning units, and dispose of four air conditioning units; $45,595 for roof and metal work; $2,132.55 to clean up chemicals; $4,566 to replace one and repair five overhead doors; and another $92,795 in building, air conditioning, fire sprinkler, plumbing, electrical, and miscellaneous repairs.[64]

There is no question the Debtor was responsible for repairing and maintaining the premises. The lease imposed on the Debtor the obligation to keep the foundation, outer walls, roof, and buried conduits in good repair.[65] The lease likewise obligated the Debtor to take good care of and maintain the premises, as well as keep the fixtures, equipment, and furnishings, in good repair.[66] And under the lease, all upkeep, repairs, and replacements were to be at the Debtor's expense.[67] But Rubin's repair and clean-up claim fails for three reasons.

For starters, the Landlord failed to prove that the Debtor was responsible for the damage to the premises. The Landlord offered into evidence a number of photos

---

[63] Landlord's Ex. 7.

[64] *Id.*

[65] Landlord's Ex. 3, at p. 6, ¶ 10(a).

[66] *Id.*

[67] *Id.*

showing the substantial damage it says the Debtor caused.[68] Those photos were taken by Dan Carter, who was the service technician responsible for "pretty much everything on the property."[69] The Landlord's owner, Les Rubin, also testified that he visited the premises after the Debtor vacated and that the Debtor did not leave the premises in "broom clean" condition, as required by the lease.[70] Rubin testified that this observation of the premises was consistent with the photos Carter took.[71]

But neither Carter nor Rubin could testify with any certainty whether the damage was done by the Debtor or PressEx, which occupied the premises before the Debtor. Carter conceded he did not know when PressEx's lease ended and when the Debtor's started.[72] In fact, he thought PressEx and the Debtor were the same tenant.[73] Rubin likewise believed PressEx and the Debtor were alter egos, although the Landlord never offered any evidence or made any legal argument on that point.[74] And neither Carter nor Rubin had any knowledge regarding whether some or all of the damages existed at the time the Debtor took over the space.[75] Rubin's inability to

---

[68] Landlord's Ex. 20.

[69] Trial Tr. at p. 16, l. 13 – p. 17, l. 4.

[70] *Id.* at p. 66, l. 15 – p. 67, l. 8.

[71] *Id.* at p. 67, ll. 9 – 11.

[72] *Id.* at p. 48, l. 24 – p. 49, l. 1.

[73] *Id.* at p. 49, ll. 5 – 9.

[74] *Id.* at 119, ll. 9 – 15.

[75] *Id.* at p. 49, ll. 13 – 16; p. 118, l. 25 – p. 119, l. 7; p. 122, ll. 3 – 11; p. 124, ll. 6 – 10.

prove whether PressEx or the Debtor caused the damages is enough to defeat Rubin's damages claim.

Moreover, the Landlord failed to prove that the $172,898.55 in repairs was required to maintain the premises in or restore them to its original condition. The Landlord's evidence on this point largely consisted of a composite exhibit that contained estimates from Total Air Conditioning & Heating ($12,370), West Coast Roofing & Contracting ($49,595), SWS Environmental Services ($2,132.55), Overhead Door ($4,566), and Commercial Interior Solutions ($98,795)[76]—and testimony by Rubin that those repairs were all necessary.[77]

But Rubin was unable to testify about any of the specifics when it came to the repairs or how they were necessary to restore the premises to the condition they were in when the Debtor took over the space. For instance, Rubin conceded he did not recollect the state of the air conditioning system when the Debtor took over the building or which tenant (PressEx or the Debtor) added certain air conditioning units to the building.[78] And he was unable to point to any report by the air conditioning contractor stating that any of the new units were being added because the existing units were inoperable or unrepairable.[79] Nor was he aware of whether any of the

---

[76] Landlord's Ex. 7.

[77] Trial Tr. at p. 62, l. 19 – p. 66, l. 5.

[78] *Id.* at p. 115, l. 17 – p. 116, l. 13.

[79] *Id.* at p. 116, l. 17 – p. 117, l. 23.

material he hired SWS Environmental Services to pick up was contaminated.[80] There was no evidence about the need to repair the overhead doors, other than two pictures of cuts to the bottom of the doors,[81] which Rubin could not testify were caused by the Debtor.[82] Rubin simply testified that he called Overhead Door to examine the doors and "see what worked, what didn't work, what repairs or replacements were necessary," and that was what their estimate reflected.[83] In another instance, Rubin added $3,000 for fire sprinkler repairs simply because the contractor said that is what he would estimate it would cost in the absence of an inspection (even though the estimate also includes $1,500 for an inspection). This, of course, is not an exhaustive list, but these examples go to show that the Landlord's evidence as to the necessity of the repairs was not convincing.

Finally, very little of the repair work has been done—and the rest of it may never be done. The Landlord did pay $2,100 for SWS Environmental Services to remove liquids from the premises.[84] But as of yet, the Landlord has not made any of the $12,370 in air conditioning repairs recommended by Total Air Conditioning & Heating.[85] Nor has the Landlord done any of the $49,595 in roof and metal work

---

[80] *Id.* at p. 121, ll. 8 – 16.

[81] Landlord's Ex. 13; Trial Tr. p. 25, l. 6 – p. 26, l. 6.

[82] Trial Tr. at p. 122, ll. 3 – 11.

[83] *Id.* at p. 64, ll. 18 – 24.

[84] *Id.* at p. 121, l. 22 – p. 122, l. 2.

[85] *Id.* at p. 117, l 24 – p. 118, l. 5.

repairs.[86] And other than some clean up, very little of the $98,795 in repairs by Commercial Interior Solutions were done.[87] In fact, the Landlord may not have to do any of these repairs because it is waiting to see who its next tenant is going to be.[88] A new tenant may require some—or none—of these repairs. And the Landlord sometimes does build-outs or improvements for tenants.[89] So the total repairs may be more or less than in the estimates the Landlord obtained.[90]

In short, the Landlord cannot prove which damages, if any, the Debtor caused to the premises; which repairs are necessary to bring the premises back to the condition they were in at the time the lease was entered into; or which repairs, if any, will ever be made. For those reasons, the Landlord failed to meet the burden of proof on its repair claim.

### The Landlord failed to prove entitlement to rejection damages

The Landlord seeks $102,506.52 for rejection damages. There is no question the Debtor rejected the lease.[91] Under Bankruptcy Code § 365, rejection of an unexpired lease constitutes a prepetition breach of the lease.[92] Ordinarily, a landlord's rejection damages would include future rent, subject to the limitations in

---

[86] *Id.* at p. 118, ll. 12 – 15.

[87] *Id.* at p. 126, ll. 18 – 23.

[88] *Id.* at p. 118, ll. 16 – 22.

[89] *Id.* at p. 126, l. 24 – p. 127 l. 5.

[90] *Id.* at p. 118 at ll. 23 – 24.

[91] Doc. Nos. 54 & 74.

[92] 11 U.S.C. § 365(g)(1).

Bankruptcy Code § 502(b)(6). Here, the Landlord's $102,506.52 claim for rejection damages consists of the rent due from the date of rejection through the end of the lease term.

The Landlord's rejection damages claim, however, overlooks its prior breach of the lease, which is discussed above. In considering prepetition damages for unpaid rent, it is one thing to say that the Court can simply abate the rent for the unusable portion of the premises. After all, the Debtor could use part of the premises during that time. It is quite another thing to say that the Landlord can refuse to repair the premises and force the Debtor to remain in a space that is no longer what they bargained for because the Debtor will otherwise be obligated for more than $100,000 in future rent if it rejects the lease.

The Debtor put on compelling evidence at trial that it was forced to reject the lease because the Landlord breached its obligation to make the insurance proceeds available. Specifically, Gabay testified that the Debtor wanted to hire more employees and grow its business, but it did not have enough room for its employees because the flood damage had not been fixed.[93] The Court credits Gabay's testimony that the Debtor had no choice but to move out if it wanted to keep its business going.[94] Because the Landlord's breach of the lease agreement essentially forced the Debtor to reject the lease, it would be inequitable to award the Landlord rejection damages in the form of future rent.

---

[93] Trial Tr. at p. 189, l. 15 – p. 190, l. 13.

[94] *Id.* at p. 189, l. 24 – p. 190, l. 3.

19

**Rubin failed to prove a breach of the alleged purchase obligation**

The Landlord seeks $247,793 in damages for the Debtor's alleged breach of a purchase obligation. An addendum to the parties' lease provided that the Debtor would buy the leased premises for $1.4 million at the end of the third lease year.[95] There is no dispute the Debtor never purchased the building from Rubin. At one point, the Landlord had a contract to sell all the Debtor's building, along with five others the Landlord owns, to Dunlop Capital for $6.7 million.[96] The Landlord allocated $1,152,207 of the purchase price to the Debtor's building.[97] The $247,793 is the difference between the purchase price in the lease addendum and the amount the Landlord could have sold the building to Dunlop Capital for. The Court, however, concludes that the Landlord waived any claim for breach of the purchase obligation.

Waiver, under Florida law, is the "voluntary and intentional relinquishment of a known right."[98] A waiver occurs where a party is aware of the existence of a right, privilege, or advantage but nonetheless intends to relinquish it.[99] A waiver may be express or implied.[100] Here, the Landlord's conduct implied a voluntary and intentional relinquishment of a known right.

---

[95] Landlord's Ex. 3, at p. 15, Lease Addendum.

[96] Landlord's Ex. 13.

[97] Rubin's six buildings totaled 211,600 square feet. Of that, the Debtor's building was 38,700 square feet—or 18.289% of the total square footage. So Rubin allocated 18.289% of the proposed purchase price—or $1,152,207—to the Debtor's building.

[98] *Raymond James Fin. Servs., Inc. v. Saldukas*, 896 So. 2d 707, 711 (Fla. 2005).

[99] *Bueno v. Workman*, 20 So. 3d 993, 998 (Fla. 4th DCA 2009).

[100] *Raymond James Fin. Servs.,* 896 So. 2d at 711.

For one thing, the Landlord never made any demand that the Debtor actually purchase the premises.[101] And for another, all of the discussion about the scope of repair work would have been unnecessary had the Debtor been obligated to buy the building. What interest would the Landlord have had in the scope of repairs if the Debtor was obligated to buy the premises? In fact, the Debtor attempted to resolve the dispute over the scope of repairs by offering to buy the building,[102] and the Landlord's response was telling.

The Landlord did not respond by telling the Debtor it was already obligated to buy the building. Instead, the Landlord attempted to negotiate a sale as if no purchase obligation existed at the time. The Landlord even agreed to a sale price that was $350,000 less than provided for in the lease addendum.[103] But the sale did not close because the parties could not agree on other terms, such as the amount of arrearages that had to be paid at closing. The Landlord's conduct in this case is entirely inconsistent with the notion that the Debtor was obligated to buy the building. Nothing about the Landlord's conduct in this case indicated it believed the Debtor was bound by the purported purchase obligation.

### The Landlord largely failed to prove its administrative expense claim

The Landlord's administrative claim has three components: (1) $2,132.55 for the removal of environmentally sensitive materials; (2) $17,012 worth of clean up;

---

[101] Trial Tr. at p. 214, ll. 2 – 7.

[102] *Id.* at p. 213, l. 3 – p. 214, ll. 11; p. 215, ll. 4 – 13.

[103] Debtor's Ex. 12; Trial Tr. at p. 111, l. 9 – p. 112, l. 14.

and (3) $6,282.65 in rent that was abated while this case was pending. The Court rejects the first two components of damages for the same reasons it rejected the Landlord's claim for repairs and clean-up costs, above. But the Court does find the Landlord is entitled to the postpetition rent as an administrative expense—albeit reduced by the 3.84% abatement for flood damage. So the Landlord is entitled to a $6,041.40 administrative claim for postpetition rent.

### Conclusion

At bottom, this case turned on the credibility of the parties' witnesses and the weight that should be given to the parties' evidence. Were the repairs the Landlord was proposing really required by the code? Did the Debtor or PressEx cause the damage to the premises? Were the repairs necessary? In the end, the Court largely found that, with the exception of the prepetition and postpetition rent due under the lease, the Landlord largely failed to carry its burden on its claims. Accordingly, it is

**ORDERED**:

1.      Debtor's objection to Landlord's proof of claim[104] is SUSTAINED, in part, to the extent set forth in these Findings of Fact and Conclusions of Law. Landlord's application for payment of administrative claim[105] is APPROVED, in part.

---

[104] Doc. No. 83.

[105] Doc. No. 99.

2.      Landlord shall have a $123,169.21 allowed claim for prepetition rent

and a $6,041.40 administrative claim for postpetition rent that had been abated

during the case.

3.      Landlord's motion to estimate its claim[106] is DENIED as moot.

---

| |
|---|
| Attorney Michael C. Markham is directed to serve a copy of these Findings of Fact and Conclusions of Law on interested parties who are non-CM/ECF users and file a proof of service within 3 days of entry of these Findings of Fact and Conclusions of Law. |

**Charles W Gerdes, Esq.**
**Keane, Reese, & Vesely & Gerdes, PA**
  *Counsel for the Debtor*

**Michael C. Markham, Esq.**
**Angelina E. Lim, Esq.**
**Johnson, Pope, Bokor, Ruppel & Burns, LLP**
  *Counsel for Rubin Automobile Boulevard, LLC*

---

[106] Doc. No. 81.